**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAUL E. CARNATHAN,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:06-CV-999** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| | : | |
| **THE OHIO NATIONAL LIFE** | : | |
| **INSURANCE COMPANY and** | : | |
| **JEFFERSON NATIONAL LIFE** | : | |
| **INSURANCE COMPANY,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Defendant Ohio National Life Insurance Company's ("Ohio

National") motion for summary judgment.  (Doc. No. 34.)  The motion has been fully briefed

and is ripe for disposition.  For the reasons that follow, the motion will be granted in part and

denied in part.

**I.      BACKGROUND**

This action began in the Court of Common Pleas of Dauphin County, Pennsylvania, on

April 12, 2006, and was removed to this Court on May 16, 2006, on the basis of diversity

jurisdiction.  (Doc. No. 1.)  In his complaint, Plaintiff seeks a declaratory judgment to reinstate

an injury and sickness total disability income policy (the "policy"), which would "provid[e] a

monthly benefit of $2500 a month for life if plaintiff becomes disabled."[1]  (Doc. No. 16, at 4);

---

[1]  In the complaint, Plaintiff also sought "punitive damages based on bad faith."  (Doc.
No. 11, at 3.)  Ohio National argues, and Plaintiff concedes, that Ohio National is entitled to
summary judgment on the bad faith claim.  (Doc. No. 35, ¶ 10.)  In light of this concession, and
upon review of the facts, the arguments of Ohio National, and relevant case law, the Court finds
that summary judgment in Ohio National's favor on the bad faith claim is appropriate.

(see also Doc. No. 2).  Plaintiff has never sought benefits under the insurance policy, nor is he doing so now; rather, he simply seeks reinstatement of the policy so that he may receive benefits should he become disabled while the policy would remain in effect.

Plaintiff, who is self-employed, purchased the policy in 1991 from Jefferson National Life Insurance Company, which contracted with Ohio National to administer the policy.  (Doc. Nos. 2 & 9, ¶¶ 2, 6, 10; Doc. No. 34, ¶ 2.)  Every year thereafter up to and including 2004, Ohio National notified Plaintiff in writing at his business address that his annual premium of $1,426.75 was due and payable (Doc. Nos. 2 & 9, ¶¶ 12, 14), and during these years Plaintiff made the appropriate payments.  In 2005, however, the policy lapsed because Plaintiff did not timely submit his annual premium payment.  (Doc. No. 34, ¶¶ 6-7.)

Plaintiff asserts that his failure to make his 2005 premium payment was a direct result of Ohio National's failure to provide him with the premium payment notice that it had sent for more than a decade prior.[2]  (Doc. No. 2, ¶¶ 24-25; Doc. No. 35, ¶ 36.)  Because he reasonably relied upon this notice, and because he can no longer obtain similar coverage at a comparable rate given his age and state of health, Plaintiff asserts that "there is no way to avoid injustice but to estop [Ohio Northern] from denying that Plaintiff is covered under his original policy in accordance with the terms set forth therein."  (Doc. No. 2, ¶ 26.)

Ohio National, however, asserts that the policy did not obligate it to provide any premium payment notice, and that in any event, it did provide Plaintiff with the customary

---

[2]  In fact, Plaintiff claims he had no idea the policy had lapsed until a letter to that effect arrived at his home address in August 2005.  In addition to informing him that the policy had lapsed, this letter invited Plaintiff to seek reinstatement of the policy (Doc. No. 35, ¶¶ 24, 27), but Plaintiff's efforts to have the policy reinstated were unsuccessful due to changes in his health since the policy's issuance (id. ¶ 30).

notices:  Ohio National claims that on April 19, 2005, it generated a premium payment

notification that it mailed to Plaintiff's business address, and that on June 10, 2005, it sent

Plaintiff a "late payment offer" that would have allowed him to submit the 2005 premium even

though the grace period for late payment had already passed. (Doc. No. 34, ¶¶ 14-16.)  Based

upon these mailings, Ohio National argues that Plaintiff cannot credibly claim that the policy

lapsed because of Ohio National's failure to provide Plaintiff adequate notice.  (Doc. No. 35, ¶¶

14-17.)  Moreover, Ohio National contends that summary judgment in its favor is appropriate

because the lapse in the policy was wholly attributable to Plaintiff, who (1) understood that he

was obligated to pay annual premiums at a set rate, (2) knew that Ohio National was not

obligated under the policy to send annual reminders, (3) had a calendar system in place for

triggering the payment of regular bills, and yet (4) failed to pay the required amount in a timely

manner.  (Doc. No. 34, at 13.)

## II.     STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  In making this determination, the Court "must view the facts in the light most favorable to

the nonmoving party and draw all inferences in that party's favor."  William Paterson Coll. of

N.J., 260 F.3d 265, 276 (3d Cir. 2001) (internal quotation marks omitted).  Thus, if a reasonable

fact finder could find in the nonmovant's favor, then summary judgment may not be granted.

Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).  The Third Circuit

has reminded that "it is important to remember that, '[w]hile the individual pieces of evidence

alone may not suffice to make out the claims asserted, [the Court] must view the record as a

whole picture.'" <u>Norfolk S. Ry. Co. v. Basell USA Inc.</u>, 512 F.3d 86, 91 (3d Cir. 2008) (quoting

<u>Abramson</u>, 260 F.3d at 276).

## III.    DISCUSSION

At the heart of Plaintiff's request for reinstatement of the policy is his contention that he

reasonably relied upon Ohio National's annual premium payment notices to remind him when,

where, and to whom annual premiums were to be sent, and that no such notice was sent or

received in 2005.  In the instant motion for summary judgment, Ohio National raises two

challenges to this contention.  First, Ohio National asserts that the company had no duty to notify

Plaintiff that his premium was due.  Second, Ohio National contends that under the "mailbox

rule" a presumption arises that Plaintiff received the premium payment notification and late

payment offer letter, a presumption that Plaintiff has failed to rebut.  The Court will address each

of Ohio National's arguments in turn.

### A.    Duty to Notify

Ohio National first argues that whether Plaintiff actually received the premium payment

notice and late payment offer letter is irrelevant because the policy imposes no obligation on

Ohio National to provide such notices.  Because Plaintiff knew he had to pay annual premiums

and failed to do so, Ohio National asserts that Plaintiff cannot now challenge the cancellation of

his policy.  Essentially, Ohio National contends that it was Plaintiff's irresponsibility, rather than

any action or inaction on its part, that caused the policy to lapse.

Acknowledging that the policy itself does not require annual premium notices to be sent,

Plaintiff nevertheless explains that he received such notices from the very beginning of the

4

policy and that he relied upon them to remind him of his obligation under the policy and to

determine when and where the annual premium was to be mailed and to whom the payment

should be addressed.  Under the circumstances, Plaintiff urges the Court to find that Ohio

National had an equitable obligation to continue to send such notices.

In Kaeppel v. Mutual Life Insurance Company of New York, 78 F.2d 899 (3d Cir. 1935),

the Third Circuit stated:

> Where he is not otherwise entitled to notice, the greater number of
> the decisions apparently support the proposition that an insurance
> company, which adopts and uniformly adheres to the custom or
> practice of giving notice of payments for such a length of time as
> leads those insured to believe notice will be given, cannot declare a
> forfeiture without giving notice, or without previously advising the
> persons who have relied upon receiving notice that the custom will
> be or has been discontinued.

78 F.2d at 903 (quoting Couch on Insurance); see 5 Couch on Ins. § 71:7 (2007) ("The

requirement that notice be given where such practice has become customary with the insurer is

predicated upon the justifiable reliance of the insured on such notice."); 16 Williston on

Contracts § 49:85 (4th ed.) ("A duty [to give notice of a premium due] may also arise from the

company's prior custom of giving the insured notice.").  More recently, the Pennsylvania

Superior Court discussed Kaeppel at length, specifically approving the trial court's reliance on

the case: "Judge Saylor did not abuse his discretion in relying upon *Kaeppel* to conclude that

Provident/Nationwide was obligated to provide notice of the amount of premium due and the

date it would be due before it could forfeit the policy for nonpayment."  Geise v. Nationwide

Life & Annuity Co. of Am., 939 A.2d 409, 420 (Pa. Super. Ct. 2007).

Here, Ohio National mailed Plaintiff annual premium payment notices from 1991 through

2004.  Based upon Ohio National's long-standing practice, and Plaintiff's stated reliance on this

practice, the Court disagrees with Ohio National's suggestion that it could, without warning, cease providing premium payment notices because no provision in the policy mandated the practice.  As explained by the New Jersey Court of Appeals, such a contention "ignores the very interest that an insurance company seeks to serve.  Such an interpretation of its relationship with the insured would create a means by which the insurer court declare a forfeiture when it was in the interest of the company to invoke the express policy provisions, yet permit the insurer to waive such provisions and collect the premiums when it was in its interest to do so."  Carfagnini v. Serv. Life Ins. Co. of Omaha, 274 A.2d 303, 472-73 (N.J. Super. Ct. 1971).  Plaintiff's contention that his failure to pay the 2005 premium flowed directly from his failure to receive the regular premium notice on which he had come to rely over the years thus precludes the entry of summary judgment based upon Ohio National's first argument.

> B.     "Mailbox Rule"

The second argument Ohio National advances is that Plaintiff in fact received the premium payment notice and the late payment offer, yet still failed to timely pay his premium. In support of this position, Ohio National invokes what is often called the "mailbox rule."  Under Pennsylvania law, proof of mailing raises a rebuttable presumption that the mailed item was received.  Samaras v. Hartwick, 698 A.2d 71, 73 (Pa. Super. Ct. 1997).  The logic underpinning the rule was explained by the Pennsylvania Supreme Court in Meierdierck v. Miller: "The overwhelming weight of statistics clearly indicates that letters properly mailed and deposited in the post office are received by the addressee."  147 A.2d 406, 408 (Pa. 1959); see Commonwealth v. Thomas, 814 A.2d 754, 758 (Pa. Super. Ct. 2002) (quoting In re Cameron's Estate, 130 A.2d 173, 177 (Pa. 1957)) ("[T]he depositing in the post office of a properly

addressed letter with prepaid postage raises a natural presumption, founded in common experience, that it reached its destination by due course of mail."); see also Philadelphia Marine Trade Ass'n-Int'l Longshoremen's Assoc. Pension Fund v. Comm'r of the Internal Revenue Serv., 523 F.3d 140, 147 (3d Cir. 2008) ("If a document is properly mailed, the court will presume the United States Postal Service delivered the document to the addressee in the usual time.").  It has often been said that "[a] presumption that a letter was received cannot be based upon a presumption that the letter was mailed." Thomas, 814 A.2d at 758 (quoting Commw. Dep't of Trans. v. Whitney, 575 A.2d 978 (Pa. Commw. Ct. 1990)).  Thus, a party seeking the benefit of this presumption must present sufficient evidence to establish that the letter was actually mailed.  See, e.g., Shafer v. A.I.T.S., 428 A.2d 152, 156 (Pa. Super. Ct. 1981) (citing Berkowitz v. Mayflower Sec., Inc., 317 A.2d 584, 585 (Pa. 1974)).  Once the presumption is established, "the party alleging that it did not receive the letter has the burden of establishing such, and merely asserting that the letter was not received, without corroboration, is insufficient to overcome the presumption of receipt." Geise, 939 A.2d at 423 (citation omitted).

Here, Ohio National relies upon evidence of its business custom to invoke the mailbox rule.  See Commw. Dept. of Trans. v. Brahman Constr. Corp., 513 A.2d 562, 566 (Pa. Commw. Ct. 1985) (quoting Christie v. Open Pantry Marts, 352 A.3d 165, 166-67 (Pa. Super. Ct. 1975)) ("[W]hen a letter has been written and signed in the usual course of business and placed in the regular place of mailing, evidence of the custom of the establishment as to the mailing of such letters is receivable as evidence that it was duly mailed.").  Specifically, Ohio National identifies two computer screen printouts that show that on April 18, 2005, and on June 9, 2005,

Carnathan's premium payment notice and the late payment offer letter were generated.[3]  (Doc. No. 34-2, at 19-22, Exs. B & C; <u>see also</u> Doc. No. 34, ¶¶ 14-15).  Ohio National also relies upon evidence of business custom: after the computer automatically generates the list of premium notices, the notices are printed and placed by an Ohio National employee into an "inserter machine" that folds the premium notices and places them into window envelopes; the notices are then metered and picked up by the PSI Group, an outside vendor that transports the letters to its facility and sorts them based upon zip code and other factors to earn bulk rate discounts under the United States Postal Service rules and regulations; after a quality control check is performed by PSI, the United States Postal Service picks up the mail at PSI's facility.  (Doc. No. 34-2, Ex. D, Jansen Dep. 38-39, 53-57; Doc. No. 34-2, Ex. H, Overley Affidavit.)

According to Mr. Overley's affidavit, PSI compares its machine count of Ohio National's mail to the count provided by Ohio National on its pickup slip, presumably as a means of quality control.  (Doc. No. 34-2, Ex. H, Overley Affidavit ¶¶ 5, 8.)  Notably, Ohio National has not provided evidence that PSI's machine count matched Ohio National's pick up slips on the

---

[3]  Ohio National takes the position that these printouts demonstrate that the aforementioned communications were, in fact, mailed.  (<u>See</u> Doc. No. 34, ¶¶ 14-15); (<u>see also</u> Doc. No. 34, at 15) ("Ohio National corporate designee Sharon Jansen testified as to the records reflecting that the Premium Notice and late payment offer were mailed to Plaintiff.").  Based upon its review of Ms. Jansen's deposition testimony, the Court disagrees with this characterization.  Rather than establishing that the correspondence was *mailed*, the reports relied on by Ohio National reflect that the correspondence was purportedly *generated* by the computer on that day.  (Doc. No. 34-2, Ex. D, Jansen Dep. 38-39, 53-57); <u>compare with</u> <u>Geise</u>, 939 A.2d at 425 ("[C]ontrary to Nationwide's position, the computerized billing lists that it generates do not necessarily establish the fact of mailing. . . .  Mr. Dubois admitted that the billing list does not indicated whether the premium notice or late offer letter were mailed.  Mr. DuBois could only presume that the notices had been mailed.  He admitted that Provident did not get any proof of mailing from the post office.  He further admitted that he did not know if any of the notices or letters were mailed and neither could Provident.") (citations omitted).

specific days that the letters in question were allegedly mailed.  Nor has Ohio National produced testimony of the personal recollection of an employee or agent who sent the premium notice or late payment offer, copies of the correspondence, or proof of mailing from the Postal Service.

In many respects, the instant case is similar to that of <u>Geise</u>, in which an insurer cancelled a policy for non-payment of the premium, and the insured maintained that it did not receive four different notices purportedly mailed by the insurer.  939 A.2d 409.  While it is true that certain "irregularities" present in <u>Geise</u> are absent here (Doc. No. 46, at 5-6) – such as testimony that, on occasion, notices were not properly printed on the paper or were ripped by the inserter machine – in both cases the insurers utilized a presorting service, presented testimony of the company's general billing and mailing procedures, and offered no direct evidence of mailing, <u>Geise</u>, 939 A.2d at 424-25.  In <u>Geise</u>, the Pennsylvania Superior Court found that the record supported the finding that "the evidence adduced by Nationwide with regard to their mailing procedures was inadequate to establish the fact of mailing," 939 A.2d at 424, and emphasized that "the question of whether an individual item was actually prepared and mailed is a purely factual determination, and as the Supreme Court has made clear, there is no presumption applicable to the resolution of such a question," <u>id.</u> at 425.

Assuming, without deciding, that Ohio National's evidence of business custom is sufficient to establish the fact of mailing and trigger the presumption of receipt, the Court nevertheless concludes that summary judgment would not be appropriate:  Plaintiff has introduced evidence which, if credited by the fact finder, is sufficient to rebut the presumption of receipt.  The mailbox rule, if properly invoked, may not be rebutted by mere denial of receipt, <u>see</u> <u>Geise</u>, 939 A.2d at 423; here, however, Plaintiff has introduced evidence corroborating his

9

assertion that he never received notice of the 2005 premium payment.  Just as Ohio National

relies upon its business practices with respect to billing and mailing in its effort to invoke the

mailbox rule, Plaintiff relies upon the business practices of his company, Colonial Electric

Service, to rebut the presumption.  See Elec. Servs. Int'l, Inc. v. Silvers, 650 N.Y.S.2d 243 (N.Y.

App. Div. 1996) (affirmation firmly denying receipt of a letter combined with strict procedures

for receiving mail found to be sufficient to rebut a presumption of mailing and receipt).

Plaintiff has provided detailed testimony about Colonial Electric's business custom with

respect to receipt of mail.  (See Doc. No. 35, ¶¶ 14-24; see generally Carnathan Dep., Mosler

Dep.)  Plaintiff collects the company's mail daily or every other day and delivers it to the desk of

Malia Moser, the company's secretary.  (Doc. No. 35, ¶¶ 15-17.)  Ms. Moser opens all the

envelopes and then systematically sorts the mail into three piles: in the first pile, she places all

envelopes containing invoices, bills, or any item requiring payment; in the second, items

addressed to Plaintiff or items that may be junk mail[4]; in the third, all items from vendors.  (Id.

¶ 17.)  Ms. Moser also orchestrates the payment of all bills: where no paper bill is sent, Ms.

Moser places payment reminders on her calendar; however, where a paper invoice or notice is

sent to the company, she enters the bill into the company's accounting software for payment

upon receipt of the bill or invoice.  (Id. ¶¶ 18-21.)  Biweekly, Ms. Moser compiles the list of bills

from the accounting software and presents them to Plaintiff for review and payment

authorization.  (Id. ¶ 22.) After Plaintiff authorizes payment, she prints out checks, which

Plaintiff signs, and then sends out the payment on each bill.  (Id.)  In years 1999 through 2004,

Ms. Moser made entries into the accounting software based upon this practice for payment of the

_____

[4]  All junk mail is placed on this pile and is never thrown out without Plaintiff's review.

10

premium on the policy at issue; however, no such entry appears for 2005.  (Id. ¶¶ 23-24.)
Plaintiff also highlights the absence of evidence of any inability on his part to meet his premium
obligations.  (Id. ¶ 31.)

Based upon review of the record, the Court finds that genuine issues of material fact
remain and must be presented to the finder of fact.  Assuming Ohio National's evidence supports
the application of the mailbox rule, Plaintiff has introduced evidence corroborating his denial of
receipt which, if believed, is sufficient to rebut the presumption that the premium payment notice
and late payment offer were received.

## IV.    CONCLUSION

The Court will grant summary judgment in Ohio National's favor with respect to
Plaintiff's bad faith/punitive damages claim; however, the Court finds that summary judgment
on the remaining claim for reinstatement of the disability income policy is inappropriate because
there remain genuine issues of material fact concerning the mailing and receipt of the premium
payment notice and late payment offer.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAUL E. CARNATHAN,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:06-CV-999** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| | : | |
| **THE OHIO NATIONAL LIFE** | : | |
| **INSURANCE COMPANY and** | : | |
| **JEFFERSON NATIONAL LIFE** | : | |
| **INSURANCE COMPANY,** | : | |
| **Defendants** | : | |

<u>**ORDER**</u>

        **AND NOW**, this 24th day of June, 2008, upon consideration of Defendant Ohio National Life Insurance Company's motion for summary judgment (Doc. No. 34), **IT IS HEREBY ORDERED THAT** the motion is **GRANTED IN PART** as follows:  Defendant Ohio National is entitled to summary judgment on Plaintiff's bad faith claim, including his request for punitive damages based upon this claim.  In all other respects, Defendants' motion is **DENIED**.

        **IT IS FURTHER ORDERED** that a telephone status conference is scheduled for July 2, 2008, at 1:30 p.m.  Plaintiff's counsel shall initiate the call.  The telephone number of the Court is 717-221-3990.

 S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania